**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                         **Plaintiff,**<br><br>             **v.**<br><br>**NIC INC., JEFFERY S. FRASER, HARRY H. HERINGTON, and ERIC J. BUR,**<br><br>                              **Defendants.** | Civil No. <u>11</u>CV-<u> 2016</u> EFM/JPO |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.       Defendant Jeffery S. Fraser, former Chief Executive Officer ("CEO") and Chairman of the Board of Directors of NIC Inc. ("NIC"), concealed from investors that he received more than $1.18 million in perquisites from NIC from at least 2002 to 2007. Defendants NIC and Fraser failed to disclose Fraser's perquisites and falsely represented in proxy statements, annual reports, and registration statements that until 2005, Fraser worked virtually for free. In NIC's 2006 and 2007 public filings, NIC and Fraser continued to materially understate Fraser's perquisites.

2.       NIC's related party transaction disclosures for 2002 through 2005 also were misleading. NIC disclosed it paid over $1.3 million to rent private planes from Fraser's entity but failed to disclose it paid an additional $1 million to other people and entities to fly and operate the planes for Fraser.

3.      Fraser's undisclosed perquisites included over $4,000 per month to live in a ski lodge in Wyoming; monthly cash payments to Fraser for purported rent for a Kansas house owned by an entity Fraser set up and controlled; vacations for Fraser, his girlfriend, and his family; Fraser's flight training, hunting, spa, skiing, and health club expenses; computers and electronics for Fraser and his family; a leased Lexus SUV; costs for Fraser to commute by private aircraft from his home in Wyoming to his office at NIC's Kansas headquarters; and other day-to-day living expenses such as groceries, liquor, tobacco, nutritional supplements, and clothing.

4.      For most of the period, Fraser did not have a personal credit card and routinely charged day-to-day living expenses on NIC credit cards.  In order to have NIC pay for these personal expenses, Fraser submitted expense vouchers that falsely claimed personal items were business related.  Fraser disregarded NIC's policies requiring him to ensure full disclosure in Commission filings and to achieve responsible use of and control over assets.  Fraser did not provide documentation of business purpose for any of his expenses before mid-2006, failed to keep accurate records of funds spent, used NIC credit cards for non-business purposes, and failed to disclose his perquisites in NIC's Commission filings.

5.      Defendant Eric J. Bur, NIC's former Chief Financial Officer ("CFO"), had responsibility, along with NIC's Chief Accounting Officer ("CAO"), for NIC's internal controls, books and records, and disclosure of executive compensation in public filings.  Bur aided and abetted NIC in its reporting, proxy, internal controls, and books and records violations.  Bur permitted NIC to pay the expenses Fraser submitted on his expense vouchers even though Bur was informed that Fraser was not submitting receipts or documentation supporting a business purpose for his expenses as required by NIC's policies.  Also, NIC's Assistant Controller raised

concerns to Bur that some of Fraser's expenses were not business related.  Bur was aware of the Commission's rules requiring the disclosure of perquisites in proxy statements and annual reports, yet he reviewed, signed, and/or certified NIC's filings with the Commission that failed to disclose Fraser's perquisites.

6.      Defendant Harry H. Herington was NIC's Chief Operating Officer ("COO") and later NIC's President and Director.  Herington aided and abetted NIC in its reporting and proxy violations.  From at least 2004, Herington received information showing that NIC was paying for some of Fraser's personal expenses.  Nevertheless, Herington reviewed and/or signed NIC's filings with the Commission that failed to disclose Fraser's perquisites.  Herington was informed of problems with Fraser's expense reporting and failed to adequately address them.  In addition, from May 2006 through July 2007, Herington failed to apply NIC's policies prohibiting personal charges on the NIC credit card when he approved Fraser's expense reports.

7.      By June 2007, a whistleblower had complained to NIC and the company learned of the Commission's investigation, yet NIC failed to fully remedy the problems involving Fraser's expenses.  At that point, NIC's Audit Committee conducted an internal review led by outside counsel (the "Internal Review").  Even after the Internal Review, the majority of Fraser's perquisites were not repaid or disclosed.

8.      Outside counsel for the Internal Review was retained to determine whether Fraser misclassified personal expenses as business expenses, and if so, whether he had acted intentionally.  In January 2008, the Internal Review concluded Fraser had intentionally misclassified his expenses.  NIC, however, failed to disclose that finding when it announced the results of its Internal Review in a Form 8-K filed in February 2008, and when it recommended

that investors re-elect Fraser to NIC's Board of Directors in its proxy statement filed in April 2008.

9.      By engaging in the conduct described in this Complaint, NIC violated the antifraud provisions of Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(2) and (3)], the proxy provisions of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78n(a)], and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3, and 240.14a-9]; the reporting provisions of  Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-11 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11]; and the books and records and internal controls provisions of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)].

10.      By engaging in the conduct described in this Complaint, Fraser violated the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]; the internal controls and books and records provisions of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; the misrepresentations to auditors provision of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]; and the proxy provisions of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9]; and aided and abetted NIC's violations of the reporting, books and records, and internal controls provisions of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and

78m(b)(2)(B)], and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

11.     By engaging in the conduct described in this Complaint, Herington violated the antifraud provisions of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)] and the internal controls and books and records provision of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]; and aided and abetted NIC's violations of the reporting and proxy provisions of Sections 13(a) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9].

12.     By engaging in the conduct described in this Complaint, Bur violated the certification provision of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] and the books and records provision of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]; and aided and abetted NIC's violations of the reporting, books and records, internal controls, and proxy provisions of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9].

13.     The Commission seeks an order enjoining NIC, Fraser, Herington, and Bur from future violations of the above provisions, requiring them to pay appropriate civil money penalties, requiring Fraser to disgorge his ill-gotten gains, imposing an officer and director bar on Fraser, and ordering NIC to undertake specific remedial relief.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act

[15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, certain of which occurred in the District of Kansas, defendants NIC, Fraser, Herington, and Bur directly or indirectly, used the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange.

16.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

**DEFENDANTS**

17.     **NIC, Inc.**, a Delaware corporation based in Olathe, Kansas, develops and manages web sites, online services, and secure payment processing systems for state, local, and federal government agencies.  At all relevant times, NIC's common stock was registered under Section 12 of the Exchange Act.  NIC's common stock is listed on the Nasdaq Global Select Market under the symbol "EGOV."

18.     **Jeffery S. Fraser**, age 51, a resident of Teton Village, Wyoming, is one of NIC's founders.  He was CEO of NIC and its predecessor Kansas Information Consortium, Inc. from January 1992 to November 1999.  He later served as NIC's CEO from May 2002 until February 2008.  Fraser was Chairman of the Board of Directors ("Board") from the Company's formation until May 2008, and a Board member until September 2009.  Fraser was a member of NIC's disclosure committee.

19.     **Harry H. Herington,** age 50, is a resident of Lawrence, Kansas.  Herington joined NIC in 1995, and has held a variety of titles with increasing responsibility including Executive Vice President of Portal Operations from January 1999 to April 2002, Chief Operating Officer from mid-2002 to May 2006, President from May 2006 to February 2008, a Board

member beginning in October 2006, CEO since February 2008, and Chairman of the Board since

May 2008.  As COO and later President, Herington was responsible for NIC's day-to-day

business operations and was a member of NIC's disclosure committee.

20.     **Eric J. Bur**, age 49, is a resident of Mission Hills, Kansas.  He was CFO of NIC

from April 2001 to June 2007, and a member of NIC's disclosure committee.  Bur reported to

Herington.  From approximately 1984 through 1995, Bur worked as an auditor for two large

accounting firms.  He had been licensed as a CPA in North Carolina starting in 1987, until that

license was forfeited in 1988.  He was also licensed to practice as a CPA in Missouri starting in

1988, and in Kansas starting in 1994, but these licenses lapsed.  Bur's certificate status in Kansas

is currently active.

## FACTS

## NIC and Fraser Failed to Disclose Over $1.18 Million of Compensation to Fraser

21.     In the early 1990s, Fraser co-founded NIC and was its CEO and Chairman of the

Board ("Chairman").  He retired as CEO in 1999, but continued to serve as Chairman.  In 2002,

when NIC was on the verge of bankruptcy, Fraser returned as CEO at the request of the Board

and agreed to take $1 in salary.

22.     In NIC's proxy statements and annual reports for 2002 through 2005, NIC and

Fraser represented that Fraser's compensation was nominal ($1 in 2002 and 2003; $5,500 in

2004 and 2005), but failed to disclose to investors that NIC actually compensated Fraser for

personal expenses.  NIC's proxy statements and annual reports for 2006 and 2007 also materially

understated Fraser's perquisites although they disclosed Fraser was receiving more than nominal

compensation.

23.     NIC and Fraser underreported Fraser's compensation in proxy statements and

annual reports filed with the Commission for 2002 through 2007 by a total of more than

$1.18 million.  This conduct violated Commission rules requiring public companies to disclose in these filings the compensation, including perquisites, of the principal executive officer.

**NIC's Misleading Related Party Transaction Disclosures**

24.     NIC's related party transaction disclosures in its proxy statements and annual reports on Form 10-K for 2002 through 2005 were misleading.  These disclosures stated that NIC rented aircraft on an hourly basis from a company owned by Fraser and another director (the "Related Party"), and that the rental payments approximated arms-length transactions (in the annual report for 2002), approximated comparable rentals (in the proxy statement for 2002), or were reasonable compared to similar services proved by third parties (in the proxy statements and annual reports for 2003 through 2005).  In fact, the total amount NIC paid for Fraser to fly on his own planes in each of these years was significantly greater than services offered by third parties.

25.     Specifically, NIC failed to disclose that it:  (i) had compared the Related Party's rates, which did not include operating costs, to rates offered by third parties that included operating costs, and (ii) had paid more than $1 million to other people and entities to operate the planes for Fraser, as summarized below.

| Year | Disclosed Rental Rates | Undisclosed Operating Costs |
|------|------------------------|-----------------------------|
| 2002 | $260,000 | $101,390 |
| 2003 | $565,000 | $410,500 |
| 2004 | $399,000 | $559,200 |
| 2005 | $114,000 | $114,000 |

Approximately $265,000 of the undisclosed operating costs was for Fraser's personal private aircraft travel, which NIC also failed to disclose as a perk.

**NIC's Internal Policies and Controls**

26.     NIC's Code of Business Conduct and Ethics ("Code of Ethics") was posted on NIC's website and referenced in NIC's proxy statements.  Among other things, the Code of Ethics required all employees to use corporate credit cards solely for business purposes and to keep accurate records of funds spent.  It also required the CEO, CFO, and CAO to:  (i) ensure full disclosure in filings with the Commission, (ii) achieve responsible use of and control over assets, (iii) establish disclosure controls to ensure that material information is included in reports and public communications, (iv) bring to the attention of the Audit Committee violations of the Code of Ethics and weaknesses or concerns about internal controls, and (v) confirm that NIC's independent auditors are aware of material misstatements or omissions in NIC's draft reports.

27.     NIC's policies required all employees to maintain proper documentation of business purpose for expenses over $10.

28.     Fraser, Herington, and Bur were aware of the Code of Ethics and NIC's policies requiring documentation for business expenses.

**Fraser's Improper Expense Reporting**

29.     Fraser ignored NIC's policies and controls by, for example:

   a.     Charging day-to-day living expenses to NIC's credit cards for most of the relevant period;

   b.     Seeking reimbursement for certain expenses he had not incurred;

   c.     Treating his personal expenses as business expenses in order to get reimbursed; and

      d.     Prior to mid-2006, not providing receipts or other documentation

           supporting a business purpose for thousands of expenses that NIC

           processed and paid on his behalf.

30.     During the relevant period, NIC paid Fraser's credit card charges that included personal expenditures. By at least 2002, Fraser began creating, signing, and submitting monthly expense vouchers that only identified some of his personal credit card charges, and failed to identify many personal charges.

31.     Of the credit card charges Fraser identified as personal, he repaid some, but avoided reimbursing NIC for others, by offsetting them against purported "out-of-pocket" expenses. For example, in October 2003, Fraser purchased a trampoline and motor sports equipment for himself totaling $1,987.67, but avoided repaying NIC for these personal items by off-setting them against purported "out-of-pocket" expenses that totaled the exact same amount.

32.     In addition, Fraser had NIC make payments directly to certain vendors for personal services, such as utilities for his home and lawn maintenance.

33.     Fraser's expenses were mischaracterized as business expenses in NIC's books and records, including expense vouchers, NIC's general ledger, and internal financial statements for NIC's executive department, when those expenses should have been recorded, characterized, classified, and disclosed as executive compensation.

34.     Fraser also completed, signed, and submitted director and officer questionnaires in which he failed to fully disclose his perquisites. For example, in the director and officer questionnaire for 2004, when Fraser was asked whether he received any perquisites in 2004, he answered "No," even though the question listed specific types of perquisites Fraser had received including housing and other living expenses, and personal travel expenses.

**Bur's Violations Began in 2002**

35.     Beginning in mid-2002, NIC's Assistant Controller told Bur that Fraser did not submit receipts or other documentation supporting a business purpose for his expenses, as was required by NIC's policies and internal controls.  Nevertheless, Bur permitted NIC to pay Fraser's expenses, which caused NIC's books, records and accounts to falsely characterize Fraser's perquisites as business expenses.

36.     By at least August 2003, Bur received documents showing that Fraser was charging some personal expenses to his NIC corporate credit card.  In August 2003, NIC's Assistant Controller emailed Bur an analysis of Fraser's credit card expenses for January 2003 through June 2003, and a detailed list of all of Fraser's credit card charges including personal items such as a gun vault, toys, and ski lift tickets.

37.     In September 2003, Bur asked NIC's Assistant Controller to update the company's analysis of Fraser's expenses through August 2003.  NIC's Assistant Controller provided Bur with an updated analysis and detailed list of charges that included personal items such as vitamin supplements and gym membership fees.

38.     In October 2003, NIC's Assistant Controller emailed Bur another updated list and analysis of Fraser's expenses, which showed that Fraser's undocumented credit card charges for the first eight months of 2003 were over $140,000 and that Fraser had not reimbursed NIC for a number of expenses that appeared on their face to be personal.  The Assistant Controller warned Bur that "[a] number of these credit card and other expenses would completely flame employees, our customers, the board, and investors if they were aware.  Hopefully, none of this is selected for audit and I won't have to explain the business purpose for these items."  The Assistant

11

Controller suggested NIC "eliminate the personal credit card expenses" and instead give Fraser "pay for performance."  Bur received a second copy of this email in January 2004.

39.     Bur did not adequately address NIC's Assistant Controller's concerns and suggestions, and continued to permit NIC's payment of Fraser's credit card and other expenses without documentation of business purpose.  Bur also failed to ensure Fraser's perquisites were disclosed in NIC's public filings.

40.     In a January 2004 email, NIC's Assistant Controller informed Bur that the amounts NIC was paying for Fraser's private jet travel from his Wyoming home to his Kansas office may be considered commuting and if so, NIC could not treat these as business expenses. Also in the email, the Assistant Controller told Bur that he did not have enough information to determine where Fraser's main place of work was and in order to treat these expenses as business expenses under IRS rules, NIC would need to perform an analysis of Fraser's business activity for one year.  This analysis was never performed, Bur continued to have NIC account for Fraser's commuting costs as business expenses, and NIC failed to disclose them as perquisites.

41.     In a June 2004 email exchange, Bur expressed concerns to NIC's CAO after reviewing some of Fraser's expense vouchers.

42.     By failing to adhere to NIC's policies and controls, including his specific obligations under NIC's Code of Ethics, Bur assisted NIC's internal controls violations.

43.     Bur also knew all of Fraser's credit card expenses were characterized as business expenses in NIC's books, records, and accounts, even though Bur knew that Fraser would later identify and repay some of these expenses as personal.

**Herington's Violations Began in at Least 2004**

44.     Beginning in at least 2004, Herington received information showing that NIC was paying certain personal expenses for Fraser.  For example, by at least June 2004, Herington received spreadsheets generated from the general ledger and some of Fraser's expense vouchers, both of which contained detailed lists of Fraser's expenses that included personal items such as charges for hair salons, sporting goods, clothing, and rifles.

45.     Additionally, Herington was informed that NIC was paying for Fraser's home in Wyoming.  In November 2004, Herington received an email from another NIC executive asking whether NIC would be renewing the lease on Fraser's condo in Teton Village, Wyoming, saying: "This is the condo Jeff is living in that we have been paying for…."  NIC extended the lease and continued paying for Fraser's home in Wyoming on a monthly basis through April 2005.

46.     In July 2005, Herington received a list of Fraser's May 2005 credit card expenses because the finance department questioned whether they were business related.  The list included charges for furniture and other household items, tanning salon services, airplane pilot lessons, and a wilderness vacation.  Although Herington inquired about a couple of the items, he failed to take meaningful action.

47.     Herington also knew NIC was leasing a luxury car for Fraser.  In October 2005, Herington attended a meeting at which NIC's Compensation Committee approved leasing a Lexus SUV for Fraser to use in Wyoming.

48.     Notwithstanding the information Herington received about NIC paying for certain of Fraser's personal expenses, Herington reviewed and/or signed NIC's filings that failed to disclose Fraser's perquisites.

**The Defendants' Violations Continued After the Commission Proposed New Executive Compensation Rules in 2006**

49.     In a February 2006 email, Bur sent Herington and other NIC executives an article about the Commission's proposed rules to expand the disclosure of executive compensation.

50.     In April 2006, NIC's Assistant Controller warned Herington by email about the risk of possible income tax fraud charges against Fraser and NIC because Fraser had not submitted any documentation of business purpose for his corporate credit card charges.

51.     On May 1, 2006, Bur sent an email to Herington noting that there was a "great concern within the accounting department regarding [Fraser's] expense reports" and that someone may "whistle blow this situation."  Bur's serious concerns about the magnitude and severity of Fraser's expense reporting failures included that:

a.     Fraser had not submitted any receipts or indicated the business purpose of any of his expenses for 2005 and the first quarter of 2006, and there were over 1,200 charges in that time period which would require a receipt under NIC's policies;

b.     Fraser charged over $26,000 at three different home/furniture stores and there were "NUMEROUS other examples" of suspicious expenses;

c.     Fraser usually charged a flat dollar amount each month for out-of-pocket charges without any receipts or explanation;

d.     A portion of Fraser's aircraft related expenses were personal;

e.     NIC paid personal expenses for Fraser: (i) without approval of NIC's Compensation and/or Audit Committees; (ii) without taking into account the tax consequences to Fraser or NIC; and (iii) without NIC reporting these expenses as perquisites;

      f.       NIC had not disclosed any of Fraser's perquisites in NIC's 2005 proxy statement;

      g.       There was a risk of Commission enforcement action based on NIC's deficient internal controls over perquisites, noting that in 2005, the Commission brought an enforcement action against Tyson Foods "because their system of internal controls did not report all of the perks to the Comp Committee" and attached two law firm alerts: (i) "important lessons" from the Tyson Foods action regarding the disclosure of perquisites; and (ii) guidance on perquisites and personal benefits;

      h.       Employees "feel that [Fraser] appears to be ripping off the company and is not required to follow the same rules that everyone else (including the execs) has to follow";

      i.       There was a "strong sentiment that the previous escalation of these matters through the normal chain of command has not been effective";

      j.       This was not "a going forward only matter - the 2005 expenses need[ed] to be dealt with"; and

      k.       NIC's Board and Compensation Committee would be making decisions without "full disclosure" from management, "particularly in view of the obligations [the CFO has] with the SEC and under [NIC's] CEO/Senior Financial Officer Code of Ethics."

52.     The Board was not informed of the specific issues raised by NIC's Assistant Controller and Bur in their emails.

53.     In mid-2006, NIC adopted additional procedures regarding executive expense reporting, but those procedures were not sufficient to remedy the problems and Fraser continued receiving undisclosed perquisites.

54.     At a Board meeting on May 2, 2006, Herington and Fraser announced to the Board new measures for Herington and Fraser to review each other's expense reports and for the Board to receive summaries of their expenses each quarter.

55.     Despite Herington's added responsibility of reviewing Fraser's expense reports from May 2006 through July 2007, Herington failed to apply NIC's policies prohibiting all NIC employees from making personal charges on NIC's credit cards and approved Fraser's monthly expense vouchers that contained charges for spa treatments and other personal items.  This resulted in NIC paying for certain of Fraser's personal expenses, which were not disclosed as compensation to Fraser.

56.     In addition, on August 4, 2006, NIC's Compensation Committee directed that to the extent Fraser's 2006 expenses lacked documentation of business purpose and/or failed to comply with NIC's expense reimbursement policy, the expenses would be treated as compensation to Fraser.

57.     In late August 2006, NIC's General Counsel sent an email to Herington reiterating that Fraser's "lack of documentation…denies the company the ability to defend itself against any assertions that the amounts charged are perks or additional compensation to Fraser" and "the manner in which these affairs of the company have been allowed to be conducted indicate at the least a potential failure of, or absence of, effective internal controls, which may render the company's financials incapable of certification by our outside auditors, or cause damaging public disclosures, or both."

58.     Notwithstanding the Compensation Committee's directive that all undocumented expenses be treated as compensation to Fraser, Bur, Herington, and other NIC executives allowed Fraser to create documentation after the fact for his 2006 expenses.  In addition, to avoid having certain 2006 personal expenses treated as compensation, Fraser repaid NIC $110,000, but contemporaneously requested and received a $110,000 bonus from NIC.

59.     In an August 2006 email, NIC's Assistant Controller told Bur that the amounts NIC had been paying to Fraser each month for the house in Kansas were not a business expense and Fraser owned the house.  Although NIC's proxy statement for 2006 reported the payments for the house as a perquisite, Bur failed to ensure that Fraser's ownership interest was disclosed.

60.     Additionally, during Fraser's review of his 2006 expenses, Herington, Bur, and other NIC executives decided it was not worth the effort to have Fraser review and repay any expenses from previous periods even though they had been informed that Fraser had not been submitting documentation of business purpose since at least 2002, and the amounts of Fraser's improper personal expenses were likely comparable each year.

61.     In a September 22, 2006 email, NIC's Assistant Controller expressed concerns to Bur regarding Fraser's past expenses and stated, "[A]s a management team it appears that we're going to whitewash the historical issue."

62.     Fraser, Herington, and Bur failed to inform NIC's independent auditors of Fraser's expense reporting problems.

**NIC's False and Misleading Proxy Statements, Annual Reports, and Registration Statements**

63.     NIC's proxy statements for 2002 through 2007 were materially false and misleading.  Among other things, Fraser received a total of more than $1.18 million of perquisites that were not disclosed in these filings.

64.     NIC's proxy statements for 2002 through 2005:  (i) misrepresented Fraser was receiving a nominal salary, when Fraser was in fact receiving substantial undisclosed compensation; and (ii) made misleading related party transactions disclosures.

65.     In proxy statements for 2003 and thereafter, NIC referred to its Code of Ethics (which applied to all NIC employees, including NIC's CEO, CFO, and CAO), as a means to promote shareholder confidence in NIC and its management.  NIC failed to disclose that: (i) Fraser was not complying with NIC's Code of Ethics as he used corporate credit cards for personal expenses, failed to document the business purpose for his expenses, failed to keep accurate records of funds spent, mischaracterized personal expenses as business expenses, and failed to disclose his perquisites in Commission filings; and (ii) Bur and the CAO were not complying with NIC's Code of Ethics because, for example, they failed to ensure that Fraser's perquisites were disclosed in Commission filings, failed to achieve responsible use and control of NIC's assets within their purview, and failed to maintain controls over Fraser's expenses.

66.     NIC's proxy statement for 2006 disclosed as a perquisite that NIC paid monthly rent and utilities for a leased house in Kansas for Fraser to use during his time spent at the company's corporate headquarters in Olathe, Kansas.   However, the proxy statement failed to disclose that the house was owned by an entity Fraser set up and controlled.

67.      NIC's proxy statement for 2007 recommended that investors re-elect Fraser to the Board, stating that NIC's policies require all directors to possess high personal and professional ethics, integrity, and values, and purported to disclose the results of the Audit Committee's Internal Review of Fraser's expenses, but failed to disclose that the Internal Review concluded Fraser intentionally misclassified his expenses.

68.     NIC's materially false and misleading proxy statements were incorporated into: (i) NIC's annual reports on Forms 10-K for 2002 through 2007; (ii) NIC's Form S-8/A filed on May 10, 2004; (iii) NIC's Form S-3 filed on October 14, 2005; (iv) NIC's Form S-8 filed on July 25, 2006; and (v) NIC's two Forms S-8 filed on November 20, 2006.  Accordingly, these annual reports and registration statements were materially false and misleading.

69.     Fraser directly solicited proxies in connection with NIC's proxy statements for 2002 through 2007, when he knew or was reckless in not knowing they were materially false and misleading.

70.     Fraser signed NIC's annual reports on Forms 10-K for 2002 through 2007, when he knew or was reckless in not knowing they were materially false and misleading.  Fraser also certified these annual reports, even though those filings materially understated his compensation, NIC's disclosure controls and procedures were ineffective with respect to Fraser's expense reporting and NIC's reporting of Fraser's compensation, and he had failed to disclose to NIC's independent auditors his fraudulent conduct.

71.     Fraser also signed registration statements filed by NIC in 2004, 2005, and 2006, when he knew or was reckless in not knowing they incorporated false and misleading proxy statements and annual reports for those years.

72.     Bur, as CFO and a member of NIC's disclosure committee, reviewed NIC's proxy statements and participated in the preparation of the executive compensation disclosures in those proxy statements that failed to disclose Fraser's perquisites and contained false statements concerning Fraser's compensation, even though Bur received information showing that NIC was paying for certain of Fraser's personal expenses.  Bur also signed the 2002 through 2006 annual reports on Form 10-K that incorporated the false and misleading proxy statements.  Accordingly,

Bur knowingly or recklessly provided substantial assistance to NIC in its filing of materially false and misleading proxy statements and annual reports.

73.     Bur certified the 2002 through 2006 annual reports.  Bur made these certifications even though these reports materially understated Fraser's compensation and NIC's disclosure controls and procedures were ineffective with respect to Fraser's expense reporting and NIC's reporting of Fraser's compensation.

74.     Herington, as a member of NIC's disclosure committee, reviewed all of NIC's public filings and, as President, signed the annual report for 2006.  Herington received information showing that NIC was paying for certain of Fraser's personal expenses yet those perquisites were not disclosed in NIC's filings with the Commission.  Accordingly, Herington knowingly or recklessly provided substantial assistance to NIC's filing of materially false and misleading proxy statements and annual reports from 2004 through 2006.

75.     Herington also signed NIC's November 20, 2006, registration statements when he knew or should have known that they incorporated NIC's 2005 proxy statement and annual report, which misrepresented that Fraser received nominal compensation and failed to disclose any perquisites for Fraser.

**Misrepresentations to NIC's Independent Auditors**

76.     Fraser signed all of NIC's management representation letters to NIC's independent auditors in connection with their annual audits of NIC's financial statements for 2002 through 2006, and their reviews in connection with the registration statements NIC filed in 2004 through 2006.  In the letters, Fraser made the following misrepresentations:  (i) that he had no knowledge of any fraud or suspected fraud involving senior management; and (ii) that he had

disclosed all deficiencies in the design or operation of internal control over financial reporting, whether or not remediated.

**NIC Failed to Correct Fraser's Expense Reporting Problems Even After Learning of the Commission Staff's Investigation in 2007**

77.     NIC failed to correct Fraser's expense reporting problems even after learning of the staff's investigation in 2007.

78.     In mid-2007, an NIC employee complained internally about, among other things, improper expense reporting by executives.  NIC failed to adequately address this complaint. After NIC learned of the Commission's investigation, the Audit Committee conducted the Internal Review of Fraser's 2004 to 2007 expenses.  However, the Internal Review was not thorough, and the majority of Fraser's perquisites still have not been repaid or disclosed.

79.     In mid-2009, the Audit Committee retained outside counsel to review Fraser's 1999 through 2003 expenses, and that review is still ongoing.

**NIC's Materially False and Misleading Form 8-K Filed in 2008**

80.     Outside counsel for the Internal Review was specifically retained to determine Fraser's intent.  In January 2008, the Internal Review concluded that Fraser's misconduct was intentional.  Shortly thereafter, Fraser resigned as CEO, but remained Chairman of the Board.

81.      NIC filed a Form 8-K after the market closed on February 6, 2008, announcing Fraser's retirement as CEO.  In the Form 8-K, NIC disclosed that Fraser had reimbursed NIC $283,000 for expenses that Fraser or the Internal Review determined were not consistent with the company's expense reimbursement policy.  The Form 8-K was misleading because it purported to disclose the results of the Internal Review but failed to disclose the Internal Review's conclusion that Fraser intentionally misclassified his expenses.

82.     In the three days of trading after this limited disclosure, NIC's stock price dropped a total of approximately 16%.  The first day it dropped approximately 2.4%, and it continued to decline each day without NIC making any additional public announcements.

## CLAIM ONE
### Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5

83.     Paragraphs 1 through 82 are hereby realleged and incorporated by reference.

84.     Defendant Fraser, by engaging in the conduct alleged above, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of NIC securities, with scienter:  (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, transactions, practices or courses of business that operated or would operate as a fraud or deceit upon other persons.

85.     By engaging in the conduct alleged above, defendant Fraser violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## CLAIM TWO
### Violations of Securities Act Section 17(a)(1)

86.     Paragraphs 1 through 85 are hereby realleged and incorporated by reference.

87.     Defendant Fraser, by engaging in the conduct alleged above, directly or indirectly, in the offer or sale of NIC's securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, with scienter, employed devices, schemes or artifices to defraud.

88.     By engaging in the conduct alleged above, defendant Fraser violated Securities

Act Section 17(a)(1) [15 U.S.C. § 77q(a)(1)].

### CLAIM THREE
### Violations of Sections 17(a)(2) and (3) of the Securities Act

89.     Paragraphs 1 through 88 are hereby realleged and incorporated by reference.

90.     Defendants NIC, Fraser and Herington, by engaging in the conduct described

above, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of NIC

securities, by use of the means or instruments of transportation or communication in interstate

commerce, or by use of the mails:  (i) obtained money or property by means of untrue statements

of material fact or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (ii) engaged in

transactions, practices or courses of business that operated or would operate as a fraud or deceit

upon purchasers of NIC securities.

91.     By engaging in the conduct alleged above, defendants NIC, Fraser and Herington

violated Securities Act Sections 17(a)(2) and (3) [15 U.S.C. §§ 77q(a)(2) and (3)].

### CLAIM FOUR
### Violations of Section 14(a) of the Exchange Act
### and Exchange Act Rules 14a-3 and 14a-9

92.     Paragraphs 1 through 91 are hereby realleged and incorporated by reference.

93.     Section 14(a) of the Exchange Act requires registrants that solicit any proxy or

consent or authorization in connection with any security registered pursuant to Section 12 of the

Exchange Act (other than an exempted security), to comply with such rules as the Commission

may promulgate.  Rule 14a-3 provides that no solicitation of a proxy may occur unless each

person solicited is concurrently furnished or has previously been furnished with a proxy

statement containing the information specified in Schedule 14A.  Rule 14a-9 prohibits, among

other things, the use of proxy statements that omit to state any material fact necessary in order to make the statements therein not false or misleading.

94.      Defendant NIC, by engaging in the conduct alleged above, furnished to investors and filed with the Commission proxy statements containing materially false and misleading statements.

95.      Defendant Fraser, a Board member, by engaging in the conduct alleged above, directly solicited proxies through the use of proxy statements that contained materially false and misleading statements.

96.      By engaging in the conduct alleged above, defendants NIC and Fraser violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

97.      Defendants Bur and Herington, by engaging in the conduct alleged above, knowingly or recklessly provided substantial assistance to NIC in its violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

98.      Defendants Bur and Herington, by engaging in the conduct alleged above, aided and abetted NIC's violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Exchange Act Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

### CLAIM FIVE
### Violations of Section 13(a) and Exchange Act Rules 12b-20 and 13a-1

99.      Paragraphs 1 through 98 are hereby realleged and incorporated by reference.

100.     By engaging in the conduct alleged above, defendant NIC, an issuer of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l], filed annual reports on Forms 10-K that were materially false and misleading.

101.    Defendant NIC, by engaging in the conduct alleged above, violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

102.    By engaging in the conduct alleged above, defendants Fraser, Bur, and Herington knowingly or recklessly provided substantial assistance to NIC in its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

103.    Defendants Fraser, Bur and Herington, by engaging in the conduct alleged above, aided and abetted NIC's violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

### CLAIM SIX
### Violations of Exchange Act Rule 13a-14

104.    Paragraphs 1 through 103 are hereby realleged and incorporated by reference.

105.    Defendant Fraser falsely certified in NIC's annual reports on Forms 10-K that he reviewed each of the reports and, based on his knowledge:  (i) the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and (ii) he had disclosed to the auditors any fraud, whether or not material, involving management.

106.    Defendant Bur falsely certified in NIC's annual reports on Forms 10-K that he reviewed each of the reports and, based on his knowledge the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

107.    The certifications for NIC's Forms 10-K stated that Defendants Fraser and Bur were responsible for establishing and maintaining NIC's disclosure controls and procedures and

internal controls over financial reporting.  Defendants Fraser and Bur each certified that he

evaluated, and presented conclusions regarding, the effectiveness of these controls and

procedures.  These conclusions were false because NIC did not have effective controls and

procedures.

108.    By engaging in the conduct alleged above, defendants Fraser and Bur violated

Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

**CLAIM SEVEN**
**Violations of Exchange Act Rule 13a-11**

109.    Paragraphs 1 through 108 are hereby realleged and incorporated by reference.

110.    Exchange Act Rule 13a-11 [17 C.F.R. § 240.13a-11]  requires all issuers with

securities registered under Section 12 of the Exchange Act to file complete and factually accurate

current reports with the Commission on Form 8-K.

111.    Defendant NIC, by engaging in the conduct alleged above, filed with the

Commission a misleading report on Form 8-K on February 6, 2008.  In so doing, NIC violated

Exchange Act Rule 13a-11 [17 C.F.R. § 240.13a-11].

**CLAIM EIGHT**
**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B)**

112.    Paragraphs 1 through 111 are hereby realleged and incorporated by reference.

113.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires

issuers to make and keep books, records, and accounts which, in reasonable detail, accurately

and fairly reflect the transactions and dispositions of its assets.  Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and maintain a system of

internal accounting controls sufficient to provide reasonable assurances that transactions are

26

114.    By engaging in the conduct alleged above, defendant NIC violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

115.    By engaging in the conduct alleged above, defendants Fraser and Bur knowingly or recklessly provided substantial assistance to NIC in its violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

116.    By engaging in the conduct alleged above, defendants Fraser and Bur aided and abetted NIC's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### CLAIM NINE
### Violation of Section 13(b)(5) of the Exchange Act

117.    Paragraphs 1 through 116 are hereby realleged and incorporated by reference.

118.    Defendants Fraser and Herington, by engaging in the conduct alleged above, knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records or accounts subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

119.    By engaging in the conduct alleged above, defendants Fraser and Herington violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

### CLAIM TEN
### Violation of Exchange Act Rule 13b2-1

120.    Paragraphs 1 through 119 are hereby realleged and incorporated by reference.

121.     Defendants Fraser and Bur, by engaging in the conduct alleged above, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

122.     By engaging in the conduct alleged above, defendants Fraser and Bur violated Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## CLAIM ELEVEN
### Violation of Exchange Act Rule 13b2-2

123.     Paragraphs 1 through 122 are hereby realleged and incorporated by reference.

124.     Defendant Fraser, by engaging in the conduct alleged above, directly or indirectly:  (i) made, or caused to be made, materially false or misleading statements; or (ii) omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review, or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

125.     By engaging in the conduct alleged above, defendant Fraser violated Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.     Permanently enjoin defendant NIC from violating Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)], Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 13a-11, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.14a-3, and 240.14a-9];

28

B.      Permanently enjoin defendant Fraser from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78n(a)], and Exchange Act Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, 240.14a-3, and 240.14a-9]; and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)], and Exchange Act Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1];

C.      Permanently enjoin defendant Herington from violating Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)] and  Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]; and from aiding and abetting violations of Sections 13(a) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9];

D.      Permanently enjoin defendant Bur from violating Exchange Act Rules 13a-14 and 13b2-1 [17 C.F.R. §§ 240.13a-14 and 240.13b2-1]; and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 14a-3, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.14a-3, and 240.14a-9];

E.      Order that defendant Fraser pay disgorgement, including prejudgment interest thereon, of the ill-gotten gains that he received as a result of the acts complained herein;

F.      Order that defendant Fraser be permanently prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l)] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

G.      Order defendants NIC, Fraser, and Herington to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

H.      Order defendant Bur to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

I.      Grant such other and further relief as the Court may deem just and proper including, but not limited to, directing defendant NIC to:  (a) retain an independent consultant to conduct a review of, and make recommendations concerning NIC's policies, procedures, controls, and training relating to payment of expenses, handling of internal complaints, and related party transactions; (b) adopt recommended controls, policies, procedures and training; and (c) have the independent consultant subsequently evaluate the implementation and effectiveness of such policies, procedures, controls, and training and provide a report with its comments, conclusions, and recommendations to the Commission; and

J.      Retain jurisdiction of this action in order to implement and carry out the terms of any Orders that may be entered herein.

Dated: January 12, 2011

Respectfully submitted,


_s/  David Frohlich_____
David Frohlich (Kansas Bar No. 13977)
Erica Y. Williams (Pro hac vice application pending)
(Virginia Bar No. 43303; District of Columbia Bar
    No. 464518)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-5546
Phone: 202-551-4963
Fax: 202-772-9228
E-mail: frohlichd@sec.gov

<u>Of Counsel:</u>

ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HOLLY A. PAL
District of Columbia Bar No. 490737
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046